UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

---

**CIVIL ACTION NO.:  2:22-CV-04987-DJP-KWR**

---

**IN RE: IN THE MATTER OF LA CARRIERS, LLC
AS OWNER AND OPERATOR OF
THE M/V KAREN KOBY
PETITIONING FOR EXONERATION FROM
OR LIMITATION OF LIABILITY**

---

JUDGE: DARRELL J. PAPILLION

MAGISTRATE JUDGE: KAREN WELLS ROBY

---

**MEMORANDUM IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

---

FILED ON BEHALF OF
LIMITATION CLAIMANT:
RIGID CONSTRUCTORS, LLC

---

RESPECTFULLY SUBMITTED:

BREAUD & MEYERS

ALAN K. BREAUD, Bar Roll No. 3420
TIMOTHY W. BASDEN, Bar No. 21469
Post Office Box 51365
Lafayette, Louisiana 70505
(337) 266-2200
FAX (337) 266-2204
alan@breaudlaw.com
Counsel for Rigid Constructors, LLC

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................ ii

MEMORANDUM IN OPPOSITION TO  MOTION FOR SUMMARY JUDGMENT ............... 1

   Background Facts .......................................................................................................... 1

      A.   The Parties and Vessels ....................................................................................... 1

      B.   The Barge AMBITION was Seaworthy Prior to the Voyage .......................................... 2

      C.   The Barge AMBITION Allided with a Navigational Pole in the Calcasieu River Due to the Negligence of the Master of M/V KAREN KOBY .................................................... 3

      D.   The Master of the M/V KAREN KOBY Disregarded Federal Regulations and Towed the Barge AMBITION as Much as Twenty Miles Offshore Overnight Without Adequate Lighting ............................................................................................. 4

      E.   The Barge AMBITION Took on Water at the Area of Its Impact with the Navigational Pole and Capsized ............................................................................................. 6

      F.   Had LA Carriers Acted Quickly, the Barge AMBITION Could Have Been Raised and Repaired ........................................................................................................ 8

      G.   The Motion for Partial Summary Judgment .................................................................. 9

   Law and Argument ...................................................................................................... 10

      A.   Summary Judgment Standards ................................................................................ 10

      B.   LA Carriers is Liable for Loss of Use Damages Incurred Prior to the Declaration that the Barge AMBITION was a Total Loss ................................................................... 11

      C.   Summary Judgment Should be Denied as the Barge AMBITION is a Custom Manufactured Vessel for which No Market for Replacement Exists and Lost Use Damages May be Factored Into the Valuation ............................................................ 12

      D.   LA Carriers Should Not Be Rewarded for Making the Barge AMBITION a Total Loss ..................................................................................................... 15

CONCLUSION ................................................................................................................ 16

CERTIFICATION ............................................................................................................ 17

## TABLE OF AUTHORITIES

### Cases

Adickes v. S.H. Kress & Co.,
  398 U.S. 144; 90 S.Ct. 1597; 26 L.Ed.2d 142 (1970) ................................................ 11

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242; 106 S.Ct. 2505; 91 L.Ed.2d 202 (1986) ............................................ 11

Barger v. Hanson,
  426 F.2d 640 (9th Cir.1970) ................................................................................ 14, 15

Celotex Corporation v. Catrett,
  477 U.S. 317; 106 S.Ct. 2548; 91 L.Ed.2d 265 (1986) ............................................ 11

Fishbones, Inc. v. S. Boat Serv. of La., Inc.,
  2002-2368 (La.App. 4 Cir. 6/4/03); 849 So.2d 803 .................................................. 14

King Fisher Marine Serv., Inc. v. NP Sunbonnet,
  724 F.2d 1181 (5th Cir. 1984) ................................................................................. 13

Matsushita Elec. Indus. Co. vs. Zenith Radio,
  475 U.S. 574; 106 S.Ct. 1348; 89 L.Ed.2d 538 (1986) ............................................ 11

Skou v. United States,
  478 F.2d 343 (5th Cir.1973) .................................................................................... 12

The Baltimore,
  75 U.S. (8 Wall.) 377; 19 L.Ed. 463 (1869) ............................................................ 15

The Conqueror,
  166 U.S. 110; 17 S.Ct. 510; 41 L.Ed. 937 (1898) .................................................... 12

The Hamilton,
  95 F. 844 (D.C.N.Y. 1899) ...................................................................................... 16

The Umbria,
  166 U.S. 404; 17 S.Ct. 610; 41 L.Ed. 1053 (1897) .................................................. 14

### Statutes

46 CFR part 7 ................................................................................................................ 3

46 CFR Subchapter E (parts 41 thru 47) ...................................................................... 3

46 USC 5102(b)(6) ........................................................................................................ 3

Federal Rule of Civil Procedure 56 ............................................................................ 10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: IN THE MATTER OF                          CIVIL ACTION
LA CARRIERS, LLC AS OWNER AND                    NO. 2:22-cv-04987-DJP-KWR
OPERATOR OF THE M/V KAREN KOBY,
PETITIONING FOR EXONERATION FROM                 SECTION: P
OR LIMITATION OF LIABILITY                       DIVISION: 4

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### MEMORANDUM IN OPPOSITION TO
### MOTION FOR SUMMARY JUDGMENT

MAT IT PLEASE THE COURT:

The present Memorandum is filed on behalf of Limitation Claimant, Rigid Constructors, LLC ("Rigid Constructors"), in opposition to the Motion by LA Carriers, LLC for Partial Summary Judgment Seeking Dismissal of Rigid's Claim for Damages in the Form of Loss of Use ("Motion for Partial Summary Judgment") [Doc. 41]. The Motion filed by Petitioner-in-Limitation, LA Carriers, LLC as Owner and Operator of the M/V KAREN KOBY ("LA Carriers"), should be denied as there are several material facts in dispute and because LA Carriers has not demonstrated a right to judgment as a matter of law.

*Background Facts*

A.    **The Parties and Vessels**

LA Carriers is a marine transportation company that provides towing services. It is the owner and operator of the tugboat, M/V/ KAREN KOBY. Rigid Constructors is a Louisiana construction firm that performs work on land, in the marshes and along the coast of Louisiana. Rigid Constructors was the owner and operator of the barge Ambition.

The barge AMBITION was an inland work platform barge without propulsion that measured 195 feet long and 70 feet wide. The vessel was outfitted with a large crane mounted on

1

its deck. The barge AMBITION was not inspected by the Coast Guard and did not have a load line certification from the American Bureau of Shipping ("ABS") or load line mark (also referred to as a "Plimsoll line").[1]

LA Carriers was retained through a broker, Patriot Marine, to transport the barge AMBITION from the Devall Barge Fleeting area in the Intracoastal Waterway near the Calcasieu River, to a job site on the Mississippi River near Myrtle Grove, Louisiana.[2] LA Carriers dispatched its towing vessel, M/V KAREN KOBY. The Master aboard M/V KAREN KOBY was Captain Chester Murphy, a tug boat captain with approximately twenty-five years of experience.[3]

**B.**     **The Barge AMBITION was Seaworthy Prior to the Voyage**

Captain Murphy acknowledged in his recent deposition that as Master of M/V KAREN KOBY, he was ultimately responsible for the seaworthiness of the barge AMBITION prior to the beginning of the voyage.[4] Prior to commencing the voyage on June 14, 2022, Captain Murphy and the crew of M/V KAREN KOBY closely inspected the barge AMBITION to confirm its seaworthiness. The crew of M/V KAREN KOBY looked in each compartment on the barge AMBITION confirming that there was no water, indicating that the vessel was fully water-tight prior to the voyage.[5] After the complete inspection, Captain Murphy concluded that the barge AMBITION was in good shape and ready to be towed.[6] No deficiencies of any kind were noted or

---

[1] Affidavit of Jeffrey Mizzi, Exhibit 2.

[2] Affidavit of Jeffrey Mizzi, Exhibit 2.

[3] Deposition of Captain Chester Murphy, Exhibit 1, pp. 19-20.

[4] Deposition of Captain Chester Murphy, Exhibit 1, pp. 163-164; 118-123.

[5] Deposition of Captain Chester Murphy, Exhibit 1, p. 125.

[6] Deposition of Captain Chester Murphy, Exhibit 1, pp. 118-122.

logged.[7] Captain Murphy testified in his deposition that it was his responsibility to make sure the barge AMBITION was seaworthy and he would not have commenced the voyage had he not been satisfied that the barge was seaworthy.[8]

The only instruction given to Captain Murphy by LA Carriers prior to the voyage was not to transport the barge in greater than four-foot to six-foot seas.[9] Upon examining the barge, Captain Murphy was aware that it was not ABS certified and that it did not have a load line.[10] No one suggested to Captain Murphy that the barge AMBITION had a single voyage load line exemption.[11] As a non-ABS certified inland vessel, federal law and regulations restricted the barge AMBITION to inland waters and offshore transport only within the boundary line in the Gulf of Mexico, which is no farther than twelve (12) nautical miles from the shore.[12]

## C.     The Barge AMBITION Allided with a Navigational Pole in the Calcasieu River Due to the Negligence of the Master of M/V KAREN KOBY

Following the complete inspection of the barge AMBITION and the determination by Captain Murphy that the barge was seaworthy and fit for towage, the barge was rigged to the M/V KAREN KOBY for the first leg of the trip between the Devall Barge Fleeting area and the Cameron fuel dock. While M/V KAREN KOBY was towing the barge AMBITION down the Calcasieu River, Captain Murphy negligently allowed the barge to impact a stationary navigational

---

[7] Deposition of Captain Chester Murphy, Exhibit 1, pp. 119-120.

[8] Deposition of Captain Chester Murphy, Exhibit 1, pp. 206-207.

[9] Deposition of Captain Chester Murphy, Exhibit 1, pp. 38-39.

[10] Deposition of Captain Chester Murphy, Exhibit 1, pp. 40, 139-140, 147.

[11] Deposition of Captain Chester Murphy, Exhibit 1, p. 140.

[12] See 46 USC 5102(b)(6); 46 CFR Subchapter E (parts 41 thru 47), load line regulations for non-ABS certified vessels; and 46 CFR part 7, the Boundary Line in the Gulf of Mexico.

pole.[13] The navigational pole impacted the barge AMBITION on the port side bow. Captain Murphy did not report the allision to anyone.[14] He did not examine the barge AMBITION to determine the extent of damage.[15] All that Captain Murphy did was examine the navigational pole through binoculars to see if the pole was damaged.[16] However, at no time did Captain Murphy or the crew of M/V KAREN KOBY examine the port bow of the barge AMBITION to determine the extent of the damage from the allision.[17]

The vessels stopped at the Cameron fuel dock to load fuel and water prior to entering the Gulf of Mexico. Neither Captain Murphy nor the crew of M/V KAREN KOBY inspected the damage to that barge AMBITION while at the dock.[18] Despite the fact that Captain Murphy and LA Carriers were solely responsible for the seaworthiness of the barge AMBITION during the towing voyage, Captain Murphy made the decision to continue on the voyage without making any assessment of the seaworthiness of the barge after the allision.

**D.**   **The Master of the M/V KAREN KOBY Disregarded Federal Regulations and Towed the Barge AMBITION as Much as Twenty Miles Offshore Overnight Without Adequate Lighting**

Captain Murphy plotted a course to tow the barge AMBITION as much as twenty (20) miles offshore in the Gulf of Mexico. He was asked why he plotted a course to take the inland barge offshore rather than staying in inland waters, and he admitted that he chose to take the barge

---

[13] Deposition of Captain Chester Murphy, Exhibit 1, p. 128.

[14] Deposition of Captain Chester Murphy, Exhibit 1, pp. 128-129.

[15] Deposition of Captain Chester Murphy, Exhibit 1, p. 129.

[16] Deposition of Captain Chester Murphy, Exhibit 1, p. 136.

[17] Deposition of Captain Chester Murphy, Exhibit 1, pp. 136-137.

[18] Deposition of Captain Chester Murphy, Exhibit 1, p. 138.

in to the Gulf of Mexico so that he could "make better time."[19] Despite his twenty-five (25) years'

experience as a towing captain, Captain Murphy *did not know and did not understand* that federal

regulations prohibited transporting the barge AMBITION more than twelve (12) nautical miles

from the shore.[20] He was under the mistaken belief that a non-ABS certified inland barge such as

the barge AMBITION could venture as much as twenty (20) miles offshore.[21] While he had gotten

single voyage load line exemptions on other occasions to transport inland barges offshore, no such

exemption was sought or obtained in this case.[22] In his twenty-five years' experience as a tug boat

captain for various towing companies, LA Carriers was the first towing company Captain Murphy

worked with that transported inland barges offshore.[23]

Once in the Gulf of Mexico, M/V KAREN KOBY let out the towing cables so that the

barge AMBITION was approximately 950-1,200 feet behind the tug. However, at that distance on

the night of the voyage, the M/V KAREN KOBY did not have adequate lighting to ensure the

safety of the barge during the towing operation. The M/V KAREN KOBY had four (4) spotlights,

none of which could actually illuminate the barge AMBITION at that distance.[24] At the distance

that the barge AMBITION was being towed behind the tug, the most that the spot lights could do

was provide enough light to see if the barge was still there, but they could not provide enough light

---

[19] Deposition of Captain Chester Murphy, Exhibit 1, pp. 47-48.

[20] Deposition of Captain Chester Murphy, Exhibit 1, p. 141. See also footnote 12, *supra*.

[21] Deposition of Captain Chester Murphy, Exhibit 1, pp. 172-173.

[22] Deposition of Captain Chester Murphy, Exhibit 1, pp. 175-176.

[23] Deposition of Captain Chester Murphy, Exhibit 1, p. 173.

[24] Deposition of Captain Chester Murphy, Exhibit 1, pp. 66-68.

to see any detail at all.[25] Captain Murphy described the visibility on the night of the voyage as at most revealing a silhouette of the barge being towed.[26]

At midnight, Captain Murphy logged that the vessels were proceeding at 4.8 knots and that the seas were two to three feet.[27] After making that log entry, Captain Murphy went to bed and the relief captain, Jarrad Williams, took over the helm of M/V KAREN KOBY. Captain Murphy did not make any entries into the ship's log to document the seas or the condition of the barge AMBITION during the dark overnight voyage through the Gulf of Mexico.

E.      **The Barge AMBITION Took on Water at the Area of Its Impact with the Navigational Pole and Capsized**

LA Carriers had no procedure to document the status of the tow at any given period of time during a voyage.[28] However, LA Carriers had an emergency procedure policy that required the tug to immediately report any noticeable change in the draft of the float line of the barge being towed.[29] During the time that Relief Captain Williams was at the helm of M/V KAREN KOBY, he did not report any changes in the float line of the barge AMBITION.[30]

At approximately 3:30 a.m. on June 15, 2022, Relief Captain Williams woke Captain Murphy and notified him that the barge AMBITION was listing.[31] Relief Captain Williams said that he first discovered that the barge was taking on water after noting that the tug slowed down

---

[25] Deposition of Captain Chester Murphy, Exhibit 1, pp. 67-68.

[26] Deposition of Captain Chester Murphy, Exhibit 1, pp. 69-70.

[27] Deposition of Captain Chester Murphy, Exhibit 1, p. 99.

[28] Deposition of Captain Chester Murphy, Exhibit 1, pp. 79-80.

[29] Deposition of Captain Chester Murphy, Exhibit 1, pp. 80-82.

[30] Deposition of Captain Chester Murphy, Exhibit 1, p. 82.

[31] Deposition of Captain Chester Murphy, Exhibit 1, pp. 82-83.

for no apparent reason.[32] Due to the insufficient lighting on M/V KAREN KOBY, all that Relief

Captain Williams and Captain Murphy could see was the silhouette of the barge behind the tug.[33]

Despite the fact that barge was obviously taking on water in the area of the port side bow, the same

area that struck the navigational pole, no report was made to LA Carriers pursuant to the

emergency procedures policy.[34] No notation of the listing barge was entered in to the ship's log.[35]

Captain Murphy testified in his deposition that it would have been prudent for him or Relief

Captain Williams to change course to head for more shallow water.[36] However, no change of

course of course was ever ordered and the tug continued ahead without any emergency actions in

approximately fifty (50) feet of water.[37]

The M/V KAREN KOBY continued ahead on autopilot without changing speed or

direction, and without any report to anyone of the peril to the barge AMBITION despite their

knowledge that the barge was taking on water in the port side bow.[38] At approximately 4:00 a.m.,

the barge AMBITION capsized in fifty (50) feet of water.[39] The port bow of the barge was on the

seabed and part of the stern deck of the barge was sticking up out of the water.[40]

Following the event, LA Carriers has floated several theories for the cause of the capsizing

of the barge AMBITION, including a theory about unsealed hatches or hatch covers. Captain

---

[32] Deposition of Captain Chester Murphy, Exhibit 1, p. 100.

[33] Deposition of Captain Chester Murphy, Exhibit 1, p. 85.

[34] Deposition of Captain Chester Murphy, Exhibit 1, pp. 83-86.

[35] Deposition of Captain Chester Murphy, Exhibit 1, pp. 99-100.

[36] Deposition of Captain Chester Murphy, Exhibit 1, pp. 86-87.

[37] Deposition of Captain Chester Murphy, Exhibit 1, pp. 87-88.

[38] Deposition of Captain Chester Murphy, Exhibit 1, p. 84.

[39] Deposition of Captain Chester Murphy, Exhibit 1, p. 83.

[40] Deposition of Captain Chester Murphy, Exhibit 1, p. 221.

Murphy, the Master of M/V KAREN KOBY, did not agree with any of those theories. In his deposition, Captain Murphy, who certified that the barge was seaworthy prior to the commencement of the voyage, testified that he believes that an event during the voyage caused the barge to capsize. He testified:

> The bottom one is a picture of the barge and that's whenever -- I mean, that's why I didn't -- that's why I disagree with the hatch covers being poorly secured as being the cause because it's got to take on – something happened to the barge to cause it to take on water.·It didn't just arbitrarily fill up with water and capsize.[41]

## F.   Had LA Carriers Acted Quickly, the Barge AMBITION Could Have Been Raised and Repaired

The barge AMBITION capsized at approximately 4:00 a.m. on June 15, 2022, approximately twenty miles offshore, south of Intracoastal City, Louisiana. LA Carriers did not take any step to raise or salvage the vessel.[42] Rather, the vessel was left partially submerged in the location where it capsized, with part of its stern sticking up above the water. The barge was not considered a total loss.[43] However, the barge AMBITION was unable to continue its service as a specialized vessel performing work that it was uniquely capable of performing. Rigid Constructors immediately began sustaining losses due to the inability of the barge AMBITION to continue to its next worksite.

On July 14, 2022, Rigid Constructors entered into a Salvage Agreement with McKinney Salvage, LLC.[44] The salvage plan was to raise the barge in one piece and either tow it to shore under its own flotation or place it on another vessel for transport to shore. The cost to Rigid

---

[41] Deposition of Captain Chester Murphy, Exhibit 1, pp. 194-195.

[42] Affidavit of Jeffrey Mizzi, Exhibit 2.

[43] Affidavit of Jeffrey Mizzi, Exhibit 2.

[44] Affidavit of Jeffrey Mizzi, Exhibit 2.

Constructors of the salvage operation was $110,000.00 per day for the salvage vessel and other separate charges for pollution control and other matters.[45]

During the time that the vessel lay partially submerged on the seabed and prior to its declaration as a total loss, Rigid Constructors sustained significant damages for loss of use. The barge AMBITION was to be deployed to a construction site near its destination port on the Mississippi.[46] However, the vessel could not be placed into service and Rigid Constructors suffered immediate significant losses. These losses are not speculative.

LA Carriers contributed to significant delays in the salvage operation by insisting upon multiple bids for salvage contractors and by delays in the final execution of the Salvage Agreement. Due to the delays, the barge AMBITION was subjected to rough seas for more than two and a half months after it was caused to capsize. Due to the destructive forces of waves, wind and storms, on August 31, 2022, the barge AMBITION broke up and became a total loss.[47]

The total cost to Rigid Constructors as a result of the salvage operation was $8,755,833.27.[48] None of these costs would have been incurred but for the gross negligence of M/V KAREN KOBY, its Master and crew.

## G.   The Motion for Partial Summary Judgment

LA Carriers has moved for partial summary judgment, claiming that the loss of use damages claimed by Rigid Constructors are not recoverable because the barge AMBITION was declared a total loss on August 31, 2022. However, the Motion fails to account for the fact that there is absolutely no impediment to the recovery of loss of use damages between June 15, 2022

---

[45] Affidavit of Jeffrey Mizzi, Exhibit 2.

[46] Affidavit of Jeffrey Mizzi, Exhibit 2.

[47] Affidavit of Jeffrey Mizzi, Exhibit 2.

[48] Affidavit of Jeffrey Mizzi, Exhibit 2.

and August 31, 2022, during the time that the vessel was not considered a total loss. The Motion should be denied on this legal issue and factual dispute.

The underlying justification for the general preclusion of loss of use damages in total loss events is that the vessel owner can use the funds recovered to replace the vessel. However, LA Carriers has not tendered anything to Rigid Constructors to replace the vessel. Accordingly, there is no justification in equity to punish Rigid Constructors and reward LA Carriers when LA Carriers has both deprived Rigid Constructors of its vessel and has not tendered the value of the vessel so that it can be replaced.

LA Carriers should not be rewarded for its grossly negligent actions in causing the capsizing of the barge AMBITION and then delaying in performing necessary salvage work to raise the barge immediately. LA Carriers did not contribute anything to the salvage effort. Instead it allowed the barge AMBITION to remain in place, subject to the destructive forces of wind, rough seas and storms, for two and a half months until the barge finally deteriorated to the point that it could not be raised in a single piece. Had LA Carriers acted to raise the barge sooner, loss of use damages would be permitted for the entire period of time required to restore the barge to working condition. LA Carriers cannot be rewarded for *causing* a total loss to reduce its exposure.

The Motion for Partial Summary Judgment should be denied.

### *Law and Argument*

A. <u>**Summary Judgment Standards**</u>

Rule 56 of the Federal Rules of Civil Procedure requires that a party moving for summary judgment present competent evidence in support of the motion. The burden on the moving party is to prove, based upon competent evidence, "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). As the United States

Supreme Court stated in *Celotex Corporation v. Catrett*, 477 U.S. 317; 106 S.Ct. 2548; 91 L.Ed.2d 265 (1986), "the moving party bears the initial burden of informing the District Court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." If the burden to prove entitlement to judgment is not met, summary judgment should be denied. If the initial burden is met, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. vs. Zenith Radio*, 475 U.S. 574; 106 S.Ct. 1348; 89 L.Ed.2d 538 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157; 90 S.Ct. 1597; 26 L.Ed.2d 142 (1970); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244; 106 S.Ct. 2505; 91 L.Ed.2d 202 (1986)(all justifiable inferences must be drawn in the non-moving party's favor).

**B.**   **LA Carriers is Liable for Loss of Use Damages Incurred Prior to the Declaration that the Barge AMBITION was a Total Loss**

In its Motion, LA Carriers relies upon jurisprudence that holds that when a vessel is declared a total loss, loss of use damages are generally no longer recoverable. However, LA Carriers concedes that loss of use damages are recoverable during any period of time when a vessel is not determined to be a total loss.

In this case, it is established, and not contested, that the barge AMBITION was not considered a total loss immediately after the incident on June 15, 2022. LA Carriers presents absolutely no evidence whatsoever to dispute this fact. The barge AMBITION was not considered a total loss until more than two and half months later, on August 31, 2022.[49]

---

[49] Affidavit of Jeffrey Mizzi, Exhibit 2.

During the time that a vessel is not determined to be a total loss, loss of use damages <u>are</u> recoverable as a matter of law. Demurrage, loss of profits from the loss of use of a vessel, has traditionally been an item of damages in admiralty. *Skou v. United States*, 478 F.2d 343, 345 (5th Cir.1973). Demurrage, "will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proved with reasonable certainty." *The Conqueror*, 166 U.S. 110, 115; 17 S.Ct. 510; 41 L.Ed. 937 (1898); *The Nicolaou Maria*, 143 F.2d 406 (5th Cir. 1944).

In this case, Rigid Constructors sustained discrete and non-speculative loss of use damages between June 15, 2022 and August 31, 2022, when the barge AMBITION <u>was not</u> considered by anyone to be a total loss. LA Carriers has failed to cite any jurisprudence that precludes the loss of use claim during that period of time. The period of time is discrete and the losses are not speculative future losses.

Additionally, LA Carriers has not cited any authority for the proposition that a subsequent declaration of total loss would *retroactively* destroy the claim for loss of use damages incurred during the time that the vessel was not a total loss.

LA Carriers has not carried its burden on its Motion for Partial Summary Judgment. Accordingly, the Motion for Partial Summary Judgment should be denied.

## C.      <u>Summary Judgment Should be Denied as the Barge AMBITION is a Custom Manufactured Vessel for which No Market for Replacement Exists and Lost Use Damages May be Factored Into the Valuation</u>

The barge AMBITION was a custom-fabricated and highly specialized work vessel. It consisted of two barge platforms fused together with an extremely large crane mounted on the deck. Rigid Constructors hired naval architects to design and supervise the fabrication of this

unique vessel. The barge AMBITION was in a class of its own. There is no available market for replacement and its value was much greater than its original cost.[50]

In the case of *King Fisher Marine Serv., Inc. v. NP Sunbonnet*, 724 F.2d 1181 (5th Cir. 1984), the Fifth Circuit held that the value of a specialized or unique vessel can be set by the court significantly higher than a simple market price. In fixing damages, the court must make an award that fully compensates the owner for the loss. In *King Fisher*, the court wrote:

> Newpark claims the evidence establishes that the market value of the barge was $30,000 because that is what King Fisher paid for it in an arm's length sale only two days before it was lost. As far as it goes, the argument is unassailable. The difficulty is that the barge was not purchased to perform as a barge. It was instead purchased for use as a drydock platform. The barge's price in the barge market is not determinative of its value because its unique capabilities made it valuable for use other than as a barge. The district court found that no "accurate market price" could be determined for this barge and uncontroverted expert testimony supported that conclusion. There was testimony that similar barges so readily transformed into drydocks were not then or have since been available. Indeed, King Fisher testified that he looked for several years before he found the now lost barge. King Fisher's expert testified that only one drydock a year is built and although it would cost $1,000,000 to build a new barge similar to the one lost, it might "not sell ... for a dime." When King Fisher bought the barge he appears to have been the only one in the market for such a drydock platform. That the market did not value the barge's use as a drydock platform was supported by the fact that King Fisher paid $30,000 for a replacement barge that could not be used as the drydock platform without considerable modification. The district court correctly found that the price paid by King Fisher for the now lost barge did not represent its value as a drydock platform.

*King Fisher Marine Serv., Inc. v. NP Sunbonnet*, 724 F.2d at 1185–86.

In the present case, there is no market whereby Rigid Constructors can purchase a vessel to replace the barge AMBITION. No such vessel exists. Rigid Constructors had to design and fabricate the vessel. La Carriers has not introduced any evidence in connection with its Motion to prove that a market value exists or that replacement is possible. Due to the unique nature of the

---

[50] Affidavit of Jeffrey Mizzi, Exhibit 2.

vessel, the Court certainly can (and should) award damages that exceed any claimed market value. These material issues preclude summary judgment.

When a vessel is a total loss but is unable to be replaced immediately, the court may award loss of use damages when the losses are for a discrete period of time, are not speculative, and the owner can demonstrate that the losses are actually incurred. In *Barger v. Hanson*, 426 F.2d 640, 642-43 (9th Cir.1970), a fishing vessel was lost and the court awarded lost profits based upon a finding that there was no replacement vessel available. The award was affirmed upon a recognition that the damages awarded were not speculative.

It is also established that even if lost profits are not awarded as a separate line item, the valuation of a vessel in a total loss also "includes the value of her future contribution to work." *Fishbones, Inc. v. S. Boat Serv. of La., Inc.*, 2002-2368 (La.App. 4 Cir. 6/4/03); 849 So.2d 803, 807. This holding has its roots in the case of *The Umbria*, 166 U.S. 404; 17 S.Ct. 610; 41 L.Ed. 1053 (1897), in which the Supreme Court held that in the case of a total loss, the valuation of the vessel includes the recovery of lost profits for work the vessel was already contracted to perform, but not losses for the performance of future speculative engagements "which had not been entered upon." *The Umbria*, 166 U.S. at 422-23.

Considering the unique facts in this case, it is apparent that the general rule is subject to adjustment and exception. LA Carriers has not presented uncontested evidence to establish that Rigid Constructors is not entitled to damages in addition to market value for barge AMBITION. In fact, LA Carriers has not addressed any of these issues or authorities. As there are legal and factual issues in dispute, the Motion for Partial Summary Judgment should be denied.

**D.    LA Carriers Should Not Be Rewarded for Making the Barge AMBITION a Total Loss**

In admiralty the maxim for computing damages in case of collision is "*restitutio in integrum*" or restoration to the previous condition. *The Baltimore*, 75 U.S. (8 Wall.) 377, 385; 19 L.Ed. 463 (1869); *Barger v. Hanson*, 426 F.2d 640, 641 (9th Cir.1970). The equitable rules of admiralty are misapplied if the tortfeasor stands to be rewarded through actions to increase the harm to the victim.

In the present case, the gross negligence and indifference of the Master and crew of M/V KAREN KOBY caused the barge AMBITION to capsize. After the event, LA Carriers failed to tender any amount to raise the vessel so that it could be repaired and placed back into service. As a result, the barge AMBITION remained in the location of its capsizing, with part of its stern sticking up out of the water. There she sat for more than two and a half months being battered daily by the wind, tide, rough seas and storms. The cumulative effect of the inaction of LA Carriers was that after two and a half months of abuse, the barge AMBITION finally succumbed to the forces of the sea and became a total loss.

The evidence in this case will show that the loss of the barge AMBITION was entirely avoidable, and was brought about by the continuing action/inaction of LA Carriers. Had LA Carriers and its insurers raised the vessel, it would have been towed to shore for repair.

Of course, had LA Carriers responded appropriately, there would be no disputing their full liability for the lost profits that would have been realized during the time that the vessel and crane were undergoing repairs. Under the facts of this case, LA Carriers had a perverse incentive to act in a manner to bring about the total loss of the barge AMBITION.

Following the declaration of the vessel as a total loss on or around August 31, 2022, LA Carriers has also not tendered any amount to Rigid Constructors so that a replacement vessel could

be constructed.[51] One of the primary justifications for the general rule regarding damages for total loss is that when paid the value of the vessel, the owner can replace it. The court in *The Hamilton*, 95 F. 844 (D.C.N.Y. 1899) wrote:

> But the law does not consider that the sunken ship is incapable of replacement. It rather considers that ships are commodities bought and sold in the market, and that one may be purchased to take the place of one lost ….

*The Hamilton*, 95 F. at 845.

The general rules only operate effectively when the parties act in a manner in line with their obligations under maritime law. However, under the facts of this case, LA Carriers caused the damage through its gross negligence and indifference. LA Carriers compounded the damages by failing to act immediately to raise the barge AMBITION and transport it to dry dock for repair. LA Carriers further compounded the harm by failing to pay any compensation to Rigid Constructors. LA Carriers should not be rewarded by relief from compensation for the damages it has caused. The granting of the Motion for Partial Summary Judgment would be a travesty under the equity principles of maritime law.

## <u>CONCLUSION</u>

For the foregoing reasons, Limitation Claimant, Rigid Constructors, LLC, respectfully requests this honorable Court to deny the Motion for Partial Summary Judgment [Doc. 41] filed by Limitation Petitioner, LA Carriers, LLC.

---

[51] Affidavit of Jeffrey Mizzi, Exhibit 2

RESPECTFULLY SUBMITTED:

BREAUD & MEYERS

*s/Alan K. Breaud*

_____
ALAN K. BREAUD, Bar Roll No. 3420
TIMOTHY W. BASDEN, Bar No. 21469
Post Office Box 51365
Lafayette, Louisiana 70505
(337) 266-2200
FAX (337) 266-2204
alan@breaudlaw.com
Counsel for Rigid Constructors, LLC

## **CERTIFICATION**

I HEREBY CERTIFY that on September 26, 2023, a copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*s/Alan K. Breaud*

_____
ALAN K. BREAUD

17