## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: IN THE MATTER OF** | **CIVIL ACTION** |
| **LA CARRIERS, LLC** | |
| **AS OWNER AND OPERATOR** | **NO. 22-4987** |
| **OF THE M/V KAREN KOBY** | |
| | **SECTION: "P" (4)** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.      INTRODUCTION

This action arises out of the capsizing and total loss of the barge, D/B AMBITION ("AMBITION"), in the Gulf of Mexico while it was being towed by the tugboat, M/V KAREN KOBY ("KAREN KOBY"), on June 15, 2022. LA Carriers, LLC ("LA Carriers"), the owner of the KAREN KOBY, filed a Petition in this Court for Exoneration from or Limitation of Liability, pursuant to 46 U.S.C. § 30501, *et seq.*[1]  Rigid Constructors, LLC ("Rigid") filed an Answer and Claim in response,[2] seeking damages for the total loss of the AMBITION, salvage costs, and damages for loss of future income.[3]

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333, 46 U.S.C. § 30501, *et seq.*, and Federal Rule of Civil Procedure 9(h).  Venue is proper in the United States District Court for the Eastern District of Louisiana.

This matter came before the Court for trial without a jury.  The Court, having carefully considered the testimony of all the witnesses, the exhibits admitted into evidence during trial, the record, and the applicable law, is prepared to rule.  Pursuant to Rule 52(a)

---

[1] R. Doc. 1.
[2] R. Doc. 10.
[3] *Id.*

of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law.  To the extent any conclusions of law constitute findings of fact, the Court adopts those conclusions as findings of fact, and to the extent any of the Court's findings of fact are more properly conclusions of law, the Court adopts these findings as conclusions of law.

## II.    FINDINGS OF FACT

1.      In June of 2022, LA Carriers owned and operated a fleet of inland and offshore towing vessels and barges.[4]

2.      In June of 2022, Rigid owned the barge AMBITION, which consisted of an e-crane material handler mounted on top of two mated deck barges, GD 962 and GD 983.[5]

3.      To create the AMBITION, Rigid purchased the two deck barges in 2020—the GD 962, a 195 foot long, 35 foot wide, 10 foot deep, steel hull deck barge, originally built in 1995; and the GD 983, also a 195 foot long, 35 foot wide, 10 foot deep, steel hull deck barge, built in 1995.[6]

4.      While Rigid's superintendent, Shane Acosta, traveled to inspect the barges in Massachusetts in connection with their purchase, the record is devoid of any checklists, inspection reports, pre-purchase photographs or other evidence showing these over 25-

---

[4] Testimony of Tommy Plaisance.
[5] Testimony of Jeff Mizzi, Principal of Rigid.
[6] Testimony of Jeff Mizzi; Testimony of Shane Acosta.

year-old barges were in a suitable condition for the construction project Rigid planned for them in 2020.[7]

5.      Rigid conducted no pre-purchase hydrostatic testing of the steel of the barges.[8]

6.      Rigid hired Global Marine Technologies, LLC ("Global Marine") to prepare the necessary naval architectural plans to "marry" the two barges, GD 962 and GD 983, and to affix an e-crane on the deck of the "mated" barges.[9]

7.      The shipyard construction work, pursuant to the plans and specifications prepared by Global Marine, was performed at Diamond B Industries.[10]

8.      At Rigid's request, Diamond B "mated" the two barges, creating a "new" crane barge that was 195 feet long and 70 feet wide with an e-crane atop the deck of the newly mated barges, and Rigid called the newly built barge the "AMBITION."[11]

9.      Rigid did not report its conversion of the two barges into the newly built AMBITION to the United States Coast Guard ("USCG"), and Rigid obtained no Certificate of Documentation from the USCG reflecting that the two barges had been converted into a single barge.[12]

10.     Rigid placed the AMBITION into service on June 19, 2020.[13]

---

[7] Acosta testified at trial that he inspected the barges with a flashlight and a chipping hammer and did not "deem it necessary" to do any scientific testing of the barges or have a professional surveyor inspect the barges.
[8] Testimony of Jeff Mizzi.
[9] Testimony of Kent Hoffmeister.
[10] Testimony of Jeff Mizzi.
[11] Petitioner's Trial Exhibit 26.
[12] Testimony of Jeff Mizzi.
[13] Testimony of Jeff Mizzi.

11.    After placing the AMBITION into service, Rigid had no formal preventative maintenance program for the AMBITION, nor did Rigid conduct regular surveys or conduct any documented formal inspections of the AMBITION to check the integrity of the barge's interior to ensure it was watertight.[14]

12.    To the extent Rigid performed informal inspections of the AMBITION, it kept no records of any such inspections.[15]

13.    On or about November 9, 2020, just a few months after the AMBITION was constructed into a "new" barge from its more than 25-year-old component barges, Rigid addressed some wasting or corrosion of the bottom plate on the starboard side of the port-side barge's hull by having a metal box welded over a corroded part of the AMBITION's hull, which the Court finds should have been a temporary repair.[16]

14.    This repair consisted of welding a steel box over a corroded area of the hull in an attempt to cover a 25-foot corrosion slot on the number one starboard compartment of the port-side barge, while epoxy was placed over several areas of the starboard compartment. The epoxy and the steel box were used on the damaged areas of the AMBITION's hull to prevent water ingress.[17]

15.    Rigid had no formal policies or procedures to ensure these repairs were holding.[18]

---

[14] Testimony of Jeff Mizzi
[15] Testimony of Jeff Mizzi; Testimony of Shane Acosta.
[16] Testimony of Jeff Mizzi; Testimony of Shane Acosta; R. Doc. 69, Uncontested Material Facts, at 7(p).
[17] Testimony of Jeff Mizzi; Testimony of Shane Acosta.
[18] Testimony of Riley Tallent-Gary; Testimony of Coby Bernard; Testimony of Kyle Smith; Testimony of Jeff Mizzi; Testimony of Shane Acosta.

16.     In March of 2022, roughly sixteen months after the first box repair, another box repair was done to the hull of the AMBITION, and this time a metal box was welded over a split in the port bow section of the barge after the AMBITION hit a rock jetty.[19] This too, the Court finds, was not a permanent repair.

17.     Indeed, the Court finds these repairs were temporary repairs to the hull of the AMBITION, and the Court finds a prudent mariner would have delivered the AMBITION to a shipyard or drydock for permanent repairs to be made.  It is obvious to the Court, in weighing the credibility of the various witnesses, that the welding of a metal box over the existing steel of a barge's hull, to cover a corroded portion of the hull, is neither a permanent, nor ideal, repair and should be considered temporary.[20]

18.     Rigid's superintendent Shane Acosta testified Rigid had no plans to have the AMBITION drydocked after these repairs were performed.

---

[19] Testimony of Jeff Mizzi; Testimony of Shane Acosta.

[20] Testimony of Kyle Smith. While Rigid's superintendent Shane Acosta testified "[t]o me, my opinion, it's a permanent fix," the Court cannot give this testimony the same credit it gives the testimony of Marine Surveyor Kyle Smith regarding the permanency of these repairs.  Indeed, while Acosta admitted "[n]aturally, if it [*sic*] ever go up on dry dock, yeah, you would replace it," and while Acosta even testified this repair would "outlast the barge," he, of course, conceded that the welded metal box was affixed to the original hull of the barge.  Obviously, while the box might "outlast the barge," the overall repair likely would not. The Court does not find Acosta's testimony persuasive, but, on the contrary, credits the testimony of Kyle Smith who explained a permanent repair could not be accomplished with the barge in the water and drydocking was necessary to crop out and renew the damaged steel.

19.     In April of 2022, the AMBITION was towed to Devall Fleeting, located in the Intracoastal Canal near the Calcasieu River, north of Cameron, where it remained until June of 2022.[21]

20.     In June of 2022, Rigid needed to have the AMBITION towed from Devall Fleeting, so it would be available for a job unloading a ship in the Mississippi River near Myrtle Grove, Louisiana. [22]

21.     In order to have the AMBITION moved from Devall Fleeting to Rigid's Mississippi River jobsite, Rigid contacted Brooks Luke ("Luke") of Patriot Marine Services, LLC ("Patriot"), an independent marine broker Rigid used, to secure a tugboat to transport the AMBITION to Rigid's Mississippi River jobsite.[23]

22.     Luke, in turn, reached out to LA Carriers, a tow company that had previously towed the AMBITION, to relocate the AMBITION for Rigid.[24]

23.     Prior to June of 2022, the AMBITION had been towed, including in the Gulf of Mexico, by other towing companies, including LA Carriers, without incident.[25]

24.     Indeed, the AMBITION, which had no means of self-propulsion, was moved frequently in connection with its work, and the AMBITION often had a tug tending it while it worked on levies, jetties, or unloading ships in furtherance of Rigid's business. [26]

---

[21] Testimony of Jeff Mizzi.
[22] Testimony of Jeff Mizzi; Testimony of Shane Acosta; Testimony of Dylan Trim.
[23] Testimony of Jeff Mizzi; Testimony of Brooks Luke.
[24] Testimony of Jeff Mizzi; Testimony of Shane Acosta.
[25] Testimony of Jeff Mizzi; Testimony of Shane Acosta.
[26] Testimony of Jeff Mizzi; Testimony of Shane Acosta.

25.     LA Carriers had towed the AMBITION in February 2022, and before that voyage, LA Carriers learned the AMBITION consisted of two older barges that had been welded together to form a single barge.[27]

26.     When it was made aware of the architectural facts related to the AMBITION's construction prior to the February 2022 tow operation, LA Carriers expressed concern whether the AMBITION could be safely towed.[28]

27.     When LA Carriers expressed this concern about whether the AMBITION could be safely towed, Patriot, through Brooks Luke, assured LA Carriers the AMBITION was safe to tow and was built to ABS specifications.[29]

28.     In truth, however, the Ambition was not certified by the American Bureau of Shipping ("ABS") or any other regulatory agency.  It did not have a load line certificate or a single voyage exemption,[30] nor did it have a "Plimsoll line," the reference mark indicating a vessel's maximum load on its hull.[31]

29.     Patriot provided LA Carriers with engineering drawings from Brymar Marine and provided the following requirements for the February 2022 tow: 1) the Ambition should be towed "near coastal;" 2) sea conditions should not exceed 4-6 feet; and 3) the voyage should not exceed 48 hours.[32]

---

[27] Testimony of Tommy Plaisance.
[28] Testimony of Tommy Plaisance; Testimony of Brooks Luke.
[29] Testimony of Brooks Luke.
[30] R. Doc. 69, Uncontested Material Facts, at 7(j).
[31] Testimony of Jeff Mizzi; Testimony of Chester Murphy.
[32] Testimony of Brooks Luke.

30.    In light of Patriot's representations, LA Carriers successfully towed and relocated the Ambition in February of 2022 without incident, on a voyage that included travel through the Gulf of Mexico.[33]

31.    When LA Carriers was contacted by Patriot to move the AMBITION for Rigid in June of 2022, LA Carriers knew the AMBITION was not ABS certified and did not have a Plimsoll mark on its hull, but, based on the representations of Rigid's broker, LA Carriers concluded the AMBITION could be safely towed, accepted the tow, and sent a tug to Devall Fleet to tow it.[34]

32.    LA Carriers assigned the job of towing the AMBITION to the tug KAREN KOBY and its Captain Chester Murphy.[35]

33.    On June 14, 2022, Captain Murphy, who had never previously seen or dealt with the AMBITION, arrived with the KAREN KOBY to tow the AMBITION from Devall Fleeting to Mile Marker 60 of the Mississippi River, with a pre-voyage stop at Stone Fuel in Cameron, Louisiana.[36]

34.    The KAREN KOBY was, at all relevant times, a USCG-inspected tugboat, equipped with adequate navigational equipment and all the necessary tools and components required for the tow.[37]

---

[33] Testimony of Tommy Plaisance.
[34] Testimony of Tommy Plaisance.
[35] Testimony of Tommy Plaisance; Testimony of Chester Murphy.  Rigid argued at trial that LA Carriers should have used a different tug, one that needed less water beneath it than the KAREN KOBY. The Court did not find this point, or the trial testimony to support it, persuasive. To the contrary, and as explained herein, the Court finds unequivocally that the specific location of the AMBITION when it capsized was not a cause of the casualty or the total loss of the AMBITION.
[36] Testimony of Chester Murphy.
[37] Testimony of Chester Murphy.

35.     Because the KAREN KOBY had a draft of 12 feet, it needed at least 15 feet of water underneath it to keep from running aground.[38]

36.     Due to the height restrictions of the AMBITION, as well as the height of its e-crane, LA Carriers concluded the AMBITION would have to be towed offshore between the Calcasieu River jetties and Southwest Pass, at the entrance of the Mississippi River.[39]

37.     As an uninspected, non-load-line-certificated barge, the AMBITION was restricted to transiting within 12 nautical miles off the coast while within the offshore waters of the Gulf of Mexico.[40]

38.     Captain Murphy was aware that, because the AMBITION did not have a load line certificate or a single voyage load line exemption, he was not supposed to take the barge outside of a specific territorial limit, but he erroneously believed this limit was 25 miles offshore instead of the actual 12-mile limitation.[41]

39.     At approximately 10:00 a.m., a Rigid crew boarded the AMBITION to prepare it for the voyage.[42]

40.     At approximately 10:20 a.m., the KAREN KOBY departed Devall Fleeting with the AMBITION in tow bound for the Stone Fuel dock, where Rigid's personnel would secure the barge's equipment and ballast it prior to departure.[43]

---

[38] Testimony of Chester Murphy.
[39] Testimony of Chester Murphy.
[40] Testimony of Marc Fazioli; Testimony of Rene Cheramie.
[41] Testimony of Chester Murphy.
[42] Testimony of Chester Murphy.
[43] Testimony of Chester Murphy.

41.     The Rigid crew traveled from Devall Fleeting to Stone Fuel to prepare the AMBITION for the voyage.[44]

42.     After the Rigid crew had finished their preparation of the AMBITION, they were called back to the AMBITION to address open hatch covers on the AMBITION.[45]

43.     The Rigid crew addressed the open hatches and informed the KAREN KOBY's captain around 5:00 p.m. that the AMBITION was ready to go and was secure for its voyage.[46]

44.     A little after 5:00 p.m., after the Rigid crew left, the KAREN KOBY departed Stone Fuel, with the unmanned AMBITION in tow, and at approximately 5:45 p.m., the tug and its tow cleared the Calcasieu River jetties into the Gulf of Mexico.[47]

45.     When Captain Murphy left the Stone Fuel dock that afternoon he believed the AMBITION was seaworthy and could proceed across the Gulf on the route he had planned.[48]

46.     Captain Murphy plotted a course that would take the AMBITION from the Cameron Sea buoy, through the Gulf of Mexico, unwittingly past the restricted territorial limits, to the mouth of the Mississippi River, and then to Myrtle Grove.[49]

---

[44] Testimony of Chester Murphy; Testimony of Shane Acosta
[45] Testimony Chester Murphy; Testimony of Antonio Clay; Testimony of Shane Acosta; Testimony of Ronnie Douget.
[46] Testimony Chester Murphy; Testimony of Shane Acosta; Testimony of Ronnie Douget.
[47] Testimony Chester Murphy; Testimony of Jerrad Williams.
[48] Testimony Chester Murphy; Testimony of Jerrad Williams.
[49] Testimony of Chester Murphy.

47.     The Court finds credible the testimony of the Captain and the Relief Captain of the KAREN KOBY, whose uncontroverted testimony, supported by the vessel logs, is that the tow of the AMBITION was uneventful during the evening of June 14, 2022.[50]

48.     The Court finds the AMBITION traveled over mild offshore sea conditions of 2 to 4 feet when it traveled in the Gulf of Mexico, even when the AMBITION was more than 12 miles offshore.[51]

49.     Jerrad Williams was the Relief Captain aboard the KAREN KOBY on June 15, 2022, and was on duty, and at the helm, from midnight until 6:00 a.m.[52]

50.     Williams would have also been at the wheel between 12:30 a.m. and 1:30 a.m. on the morning of June 15, 2022, a period during the voyage Rigid believes to have been important but which the Court finds a lack of evidence from which the Court can make any meaningful factual finding.[53]

51.     At approximately 3:30 a.m. on June 15, 2022, Williams began to notice an unexpected slowing of the tow.  Williams used a spotlight and binoculars, and he noticed an apparent listing of the AMBITION.[54]

---

[50] Testimony Chester Murphy; Testimony of Jerrad Williams; Petitioner's Trial Exhibit 2.
[51] Testimony Chester Murphy; Testimony of Jerrad Williams; Petitioner's Trial Exhibit 2.
[52] Testimony of Jerrad Williams.
[53] During the trial, Rigid argued that something happened around 1:30 a.m. because Rigid lost GPS contact with the AMBITION at that time, when Rigid contends other GPS evidence shows the tow had been in the same location for approximately an hour, and because the Conex box on the deck of the AMBITION, where the GPS equipment was situated, could not be located with the AMBITION's wreckage, and this represents some fault on the part of LA Carriers. The Court, however, cannot credit this argument in light of the available evidence.  Rigid failed to show at trial how this evidence proves wrongdoing or fault on the part of LA Carriers, particularly in light, as explained herein, of the overwhelming evidence of waste, decay, and improper maintenance of the AMBITION.
[54] Testimony of Jerrad Williams.

52.     Williams reported the situation to Captain Murphy who was off duty and in his quarters.[55]

53.     Captain Murphy soon arrived in the wheelhouse and observed the AMBITION listing to port, but Captain Murphy did not see any water, waves, or significant spray affecting the AMBITION in the calm seas.[56]

54.     The Court finds credible the testimony of Captain Murphy and relief Captain Williams that when the crew of the KAREN KOBY came to understand the barge was listing, there was very little, if anything, that could be done to prevent the barge from capsizing.

55.     At approximately 4:00 a.m., on June 15, 2022, the AMBITION capsized to port, becoming partially submerged in approximately 50 feet of water, roughly 18 nautical miles from the Louisiana coast.[57]

56.     Rigid contracted with McKinney Salvage LLC for the wreck removal of the AMBITION which was not completed until weeks later.[58]

57.     While capsized and in the water, the AMBITION was subject to sea conditions, including saltwater, waves, swells, and other environmental factors.[59]

58.     The AMBITION was rendered a total loss as a consequence of it having capsized in the Gulf of Mexico.[60]

---

[55] Testimony of Jerrad Williams
[56] Testimony of Chester Murphy.
[57] Testimony Chester Murphy; Testimony of Rene Cheramie.
[58] Testimony of Jeff Mizzi; Testimony of Aaron McKinney.
[59] Testimony of Aaron McKinney.
[60] R. Doc. 69, Uncontested Material Facts, at 7(d); Testimony of Jeff Mizzi.

## III. CONCLUSIONS OF LAW

1.     As an uninspected, non-load line barge, the AMBITION was restricted to transiting within 12 nautical miles off the coast while within the offshore waters of the Gulf of Mexico.[61]

2.     In a contract for towage, the owner of a barge warrants that the vessel offered for towage is sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage.[62]

3.     If the tow is unseaworthy by reason of weakness, decay, or leaks, and these defects are not obvious to the master of the tug, the tug will be absolved from responsibility for such unseaworthiness if it is the cause of the damage. This principle is commonly referred to as the warranty of seaworthiness.[63]

4.     The owner of the tug may rely on the warranty of seaworthiness and is under no duty to make a detailed inspection of the vessel either prior to or during the voyage itself. The owner of the tug is entitled to assume the vessel it is towing is seaworthy.[64] Here, the Court finds it was proper for LA Carriers to rely on the representations made by Rigid's broker and its own visual inspection that the AMBITION was seaworthy.

---

[61] *See* 46 U.S.C. § 5102(b)(6); 46 C.F.R. §§ 41–47; 46 C.F.R. § 7.5.

[62] *In re B&J, Inc*., 672 F. Supp. 3d 192, 207 (W.D. La. 2023); *Kenny Marine Towing v. M/V JOHN R. RICE*, 583 F. Supp. 1196, 1198 (E.D. La. 1984).

[63] *Kenny Marine Towing*, 583 F.Supp. at 1198.

[64] *Id.*; *see also National G. Harrison Overseas Corp. v. American Tug Titan*, 516 F.2d 89, 94 (5th Cir. 1975); *Zurich Ins. Co. v. Crosby Tugs, L.L.C*., No. CIV. A. 99-2748, 2001 WL 883224, at *3 (E.D. La. Aug. 1, 2001), aff'd, 46 F. App'x 732 (5th Cir. 2002); *In re Gladiator Marine, Inc*., No. CIV. A. 98-2037, 2000 WL 28175, at *8 (E.D. La. Jan. 14, 2000); *Theriot v. Dawson Prod. Servs., Inc*., No. CIV. A. 97-1900, 1998 WL 637384, at *9 (E.D. La. Sept. 16, 1998).

5.      The owner of a tug is not an insurer of his tow but is obligated to use such care in the performance of its work that a prudent navigator would under the circumstances, and the burden of proving negligence is on the party that asserts it against the tug.[65]

6.      The principal duty of the tow is to provide a seaworthy vessel with equipment and structural characteristics that are reasonably necessary to undertake the voyage.[66]

7.      Despite the rule that there is no presumption of negligence merely because the tow is lost, the proof of an occurrence that would not normally occur, particularly when the tow is unmanned, places the tug under an obligation to make some satisfactory explanation or reasonable excuse for the damage.[67]

8.      While the burden of proof of negligence remains with the claimant, that burden is satisfied by evidence of an occurrence or damage that is inconsistent with proper towage coupled with a failure of explanation by the tug.[68]

9.      A tug has the obligation to keep a close watch over the vessel under tow.[69]

10.     When a barge in tow sinks in calm water for no immediately ascertainable cause, in the absence of proof of improper handling, the barge's sinking is presumed to be a direct result of its unseaworthiness.[70]  The Court finds the AMBITION capsized in calm

[65] *Stevens v. The White City*, 285 U.S. 195, 202 (1932); *In re B&J, Inc*., 672 F. Supp. 3d at 207.
[66] *Martin v. Southwark*, 191 U.S. 1 (1903); 2 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 12:5 (6th ed.).
[67] 2 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 12:3 (6th ed.).
[68] *Id.*
[69] *A.E. Staley Mfg. Co. v. Porto Rico Lighterage Co.*, 323 F.Supp. 27, 38 (E.D. La. 1970), *aff'd*, 438 F.2d 1 (5th Cir. 1971).
[70] *Consol. Grain & Barge Co. v. Marcona Conveyor Corp.*, 716 F.2d 1077, 1081 (5th Cir. 1983).

waters, and, as such, LA Carriers is entitled to the rebuttable presumption that the AMBITION was unseaworthy.

11.    The Court concludes there is no evidence of an event or ascertainable cause of the capsizing of the AMBITION other than the wasted hull of the AMBITION which, as further explained below, the Court finds is the proximate cause of its failure, and that any act or omission on the part of LA Carriers that constituted negligence or fault did not actually cause the loss of the AMBITION.

12.    The Court concludes any violation of a rule or statute by the Captain of the KAREN KOBY, including but not limited to taking the AMBITION more than 12 miles offshore was not the cause of the calamity.  The cause of the calamity was the lack of structural soundness of the more than twenty-five-year-old, poorly maintained barges that were used in the construction of the AMBITION.[71]

13.    Robert Bartlett, an expert in metallurgical engineering and failure analysis, inspected the AMBITION after it capsized and did ultrasonic testing on the metal of the AMBITION's hull to determine its thickness and to determine whether, and to what extent, the hull was the victim of wastage.

14.    The Court finds Bartlett, who demonstrated areas where the hull of the AMBITION had suffered severe metal wastage, including a corrosion hole in the barge that was about 25 feet long, to be very credible.

---

[71] Under the rule of *The Pennsylvania*, 86 U.S. 125 (1873), when a party to a maritime casualty violates a federal statute, it has the burden of proving the statutory violation could not have contributed to the casualty. The Court finds LA Carriers has met its burden in this case, and the cause of the casualty was the unseaworthiness of the AMBITION.

15.     Bartlett testified this hole in the hull of the AMBITION was emblematic of corrosion wastage because the edges of the hole were feathered, and the metal at the edges of the hole were thin and not deformed.  Bartlett explained that if the hull had been damaged during salvage operations, as Rigid maintained at trial, he would have expected to see a puncture or inward dent of the hull, but this was not the kind of hull damage he observed.

16.     The Court finds credible Bartlett's testimony that the thinning he observed in the steel of the barge would not have occurred during the weeks the AMBITION was sitting in the waters of the Gulf of Mexico after it capsized, and the Court concludes the cause of the failure of the AMBITION was its unseaworthiness due to corrosion and wastage and not by the pounding effect of rough seas as argued by Rigid.

17.     The Court does not find the testimony offered at trial by Rigid, through its expert Michael Hassett, that damage to the AMBITION's hull was caused by pounding of the hull by rough seas to have been credible.  Similarly, while the Court finds that there was, of course, damage to the AMBITION as a result of the salvage operations, the Court finds that any damage caused by salvage operations was insufficient to preclude the Court from reaching the firm conclusion that the AMBITION was unseaworthy because of its severely wasted and corroded hull and interior bulkheads.

18.     While the Court does not doubt that Shane Acosta of Rigid likely inspected the barges in 2020, and even thereafter, as he testified, the Court finds the testimony of Bartlett and the results of Bartlett's scientific investigation, substantially more credible than the testimony and lay opinions of Acosta.

19.    Bartlett inspected and tested the bulkheads separating the forward four compartments of the port barge and testified he identified holes in the lower several feet of these bulkheads that were supposed to be watertight.

20.    The four forward watertight bulkheads, based upon Bartlett's observation, had enough holes in them to render them useless for the intended purpose of subdividing the hull.

21.    Rigid provided no credible evidence at trial to refute LA Carriers' evidence the AMBITION's bulkheads were wasted and allowed water to transgress from one compartment to another during the subject voyage, and the Court concludes wastage and decay caused the AMBITION to take on water and capsize.

22.    The Court also finds Bartlett's testimony explaining that the corrosion of the Ambition's hull was not caused by mechanical damage arising from the salvage operations to be very credible.

23.    The Court finds that Rigid breached its duty to provide LA Carriers with a seaworthy vessel.

24.    If the unseaworthiness of the tow is apparent or disclosed, the tug has a duty to take reasonable steps to determine the exact condition of the tow and to take action to save the tow.[72]  Here, however, the Court finds the barge AMBITION contained latent defects, primarily in the form of a severely weathered and corroded hull that was hidden

---

[72] *McDonough Marine Serv., Inc. v. M/V Royal St.*, 465 F.Supp. 928, 935 (E.D. La. 1979), *aff'd*, 608 F.2d 203 (5th Cir. 1979).

from LA Carriers' knowledge and sight and was the type of defect a reasonable inspection by the tug's crew would not reveal.

25.    LA Carriers cannot be held responsible for the nonapparent unseaworthiness of the AMBITION, and Captain Murphy had no legal duty to undertake the type of inspection that would have revealed the AMBITION's latent defects.[73]

26.    The Court finds that LA Carriers satisfied its duty to conduct a reasonable inspection of the AMBITION as required by applicable law.  While LA Carriers knew the AMBITION was not certified, it did not have an obligation to do a detailed structural assessment of the hidden, unseen parts of the AMBITION that scientific evidence revealed were wasted and corroded and was reasonable in relying on the representations of Rigid's broker.

27.    Further, LA Carriers is entitled to a presumption that the Ambition was unseaworthy since it sank in calm waters.   Rigid represented to LA Carriers the AMBITION was capable of traversing through 4-to-6 foot seas, and the Court finds the actual conditions, as verified by the credible testimony of the crew of the KAREN KOBY, it logs, and the analysis of LA Carriers' meteorologist expert, Austin Dooley, which the Court found credible, were only 2 to 3 feet at all material times.

28.    While an owner can overcome the presumption of unseaworthiness by showing evidence of good maintenance of the vessel,[74] the record in this case is devoid of

---

[73] *See New Orleans Coal & Bisso Towboat Co. v. United States*, 86 F.2d 53, 60–61 (5th Cir. 1936), *cert. denied*, 300 U.S. 676 (1937).
[74] *See P.T. Tugs, Inc. v. United States Fire Ins. Co.*, 796 F.2d 125, 126–27 (5th Cir. 1986).

any maintenance records, permanent repairs, surveys, or inspections showing the good condition of the hull of the Ambition before it was delivered to LA Carriers. In fact, Rigid's corporate representative and general superintendent in charge of the marine division, testified that there were no plans in place by Rigid to ever take the Ambition to a shipyard or dry dock.[75]

29.     But, regardless of the presumption of unseaworthiness of the Ambition due to its sinking in calm waters, the Court finds, even if no such presumption existed, based upon the totality of the evidence presented and considering the credibility of the witnesses who testified at trial, the AMBITION was actually unseaworthy, and it is the conclusion of the Court that the unseaworthiness of the AMBITION was the sole and proximate cause of its loss and demise.

30.     The Court finds the arguments made by Rigid as to the negligence of LA Carriers that Rigid contends resulted in the unseaworthiness of the AMBITION are not valid because there is a critical failure of proof on the issue of causation. Rigid's skilled and excellent counsel argued mightily at trial that the AMBITION capsized because it struck a navigational marker while being towed by the KAREN KOBY in the Calcasieu River which perhaps punched a hole in the AMBITION, causing it to sink roughly 20 hours later. The Court cannot give credit to this theory, however, and finds that, even if the AMBITION struck a navigational pole or channel marker, this was not the cause of the loss in this case. While Captain Murphy testified the AMBITION may have come into

---

[75] Testimony of Jeff Mizzi.

contact with a navigational marker while under tow, the Court finds an absence of proof that this contact had anything to do with the loss of the AMBITION.

31.    To the extent Rigid contends the Captain of the KAREN KOBY caused the loss of the AMBITION by navigating the AMBITION some 18 nautical miles offshore and that this conduct was below the standard owed by a prudent tug operator, the Court also finds a failure of proof on this issue of causation.  While the Court agrees the AMBITION's status as an uninspected vessel without a load line certificate required the AMBITION to be navigated within 12 nautical miles of the coast unless a temporary load line exemption was obtained from the Coast Guard, the Court heard extensive testimony from the Captain of the KAREN KOBY that it was not possible to stay within 12 nautical miles of the coast due to shallow shoals and energy-related infrastructure.  The Captain thus navigated closer to 18 nautical miles where the KAREN KOBY and AMBITION would not go aground or strike energy-related infrastructure and could maintain a speed sufficient so as not to tow the AMBITION in excess of 48 hours, as instructed by Rigid.  The Court also heard, and found credible, the testimony of LA Carriers' expert meteorologist, Austin Dailey, who testified the seas were the same 2-to-3 foot seas all the way to 60 miles offshore. In other words, there was no difference in the sea conditions the AMBITION experienced as a result of being 18, instead of 12 or fewer, miles offshore.  Accordingly, the Court finds the Captain's route choice and the presence of the AMBITION in excess of 12 miles from the coast was not a factor in this casualty event.

32.    The Limitation of Liability Act, 46 U.S.C. § 30501, *et seq.*, allows a vessel owner to limit its liability to the value of the vessel at the conclusion of the voyage, plus

any pending freight if it had no privity or knowledge of any unseaworthy condition or negligent act that that was a proximate cause of the accident.  "When a court determines whether a shipowner is entitled to exoneration or limitation of liability, it employs a two-step process."[76]  "First, the party seeking to dissolve limitation must establish that the vessel was negligent or unseaworthy, and those acts caused the accident."[77]  "Then, 'the burden shifts to the owner of the vessel to prove that negligence [or unseaworthiness] was not within the owner's privity or knowledge.'"[78]  For all the reasons set forth above, the Court finds the cause of the loss of the AMBITION was its own unseaworthiness, and, therefore, LA Carriers is not legally liable to any extent whatsoever for any losses, damages, injuries, or claims arising from or as a consequence of the subject voyage.

## IV.   CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court finds LA Carriers is entitled to exoneration from liability on all claims brought by Rigid.  The Court will enter a judgment to that effect by separate order.

New Orleans, Louisiana, this 30th day of September 2024.

**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**

---

[76] *Cont'l Ins. Co. v. L&L Marine Transp. Inc.*, No. 14-2967, 2017 WL 4844272, at *3 (E.D. La. Oct. 26, 2017) (citing *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976)).
[77] *Id.* (citing *Petition of Kristie Leigh Enterprises, Inc.*, 72 F.3d 479, 481 (5th Cir. 1996)).
[78] *Id.* (quoting *In re Hellenic Inc.*, 252 F.3d 391, 395 (5th Cir. 2001)).